UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NATURAL GOLF CORPORATION, *et al.*,[1] | ) | Case No. 05-18603 |
| | ) | |
| Debtors. | ) | Hon. Bruce W. Black |
| | ) | (Jointly Administered) |

**FINAL ORDER AUTHORIZING INCURRENCE OF
INDEBTEDNESS WITH ADMINISTRATIVE SUPER-PRIORITY
AND SECURED BY SENIOR LIENS ON AND SECURITY INTERESTS IN
SUBSTANTIALLY ALL ASSETS OF THE DEBTORS PURSUANT TO
SECTIONS 364(c)(1), (2) AND (3) OF THE BANKRUPTCY CODE**

This matter coming to be heard on the Emergency Motion (the *"Motion"*) of Natural Golf

Corporation and its affiliated debtor subsidiaries (collectively, *"NGC"* or *"Debtors"*), as debtors

and debtors-in-possession in the above-captioned chapter 11 cases, for the entry of an order

authorizing the Debtors to, *inter alia*:

    (a)    approve the Debtors' entry into the DIP Loan Agreement (as defined below);

    (b)    obtain, under sections 364(c)(1), (2) and (3) and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the *"Bankruptcy Code"*), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*), post-petition financing (the *"DIP Financing"*) pursuant to the terms and conditions of (i) that certain Debtor-In-Possession Loan and Security Agreement, dated as of May 10, 2005 (the *"DIP Loan Agreement"*) between the Debtors as borrowers and NG Acquisition LLC (*"Lender"*) as lender, and any other agreements, instruments and documents entered into in connection with the DIP Loan Agreement (collectively, the *"DIP Loan Documents"*)[2] ;and

    (c)    give Lender assurance for the full and timely payment by and performance of the obligations and indebtedness of the Debtors to the Lender in connection with such post-petition financing, including, without limitation, all principal, interest, costs, fees and expenses by granting to the Lender (i) pursuant to section 364(c)(1) of the Bankruptcy Code, an administrative expense claim allowable under

---

[1]    The other debtors in these jointly administered chapter 11 cases consist of Natural Golf Products Corporation, Natural Golf Field Sales Corporation and Natural Golf Schools Corporation.

[2]    All capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the DIP Loan Agreement.

section 503(b) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 105, 503(b), 506(c) and 507(b) of the Bankruptcy Code, subject, as to priority, only to fees payable pursuant to 28 U.S.C. §1930(a)(6); and (ii) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, a continuing Lien on, with first priority except as specifically provided below, all of the following: all of the Debtors' property and interests in property, whether real, personal or mixed, now existing or owned or hereafter arising or acquired, and wherever located, including, without limitation, all of its right, title and interest in and to all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, goods, real property interests, franchise rights, patents, trade names, copyrights, intellectual property, software, general intangibles, avoidance actions and recoveries arising under sections 544, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code ("*Avoidance Actions*"), investment property and all substitutions, accessions, insurance proceeds and other proceeds of the foregoing (collectively, the "*Collateral*").

The Debtors have requested in the Motion that this Court consider the final approval of the DIP Financing; notice of the hearing on this request (the "*Final Hearing*") having been given to (a) the Office of the United States Trustee, (b) Lender (and its counsel), (c) each of the Debtors' consolidated thirty (30) largest unsecured creditors of the Debtors, (d) the Securities and Exchange Commission, (e) VenCore (as defined below), and (f) all other parties asserting a lien on or security interest in the Debtors' assets or property; and it appearing that under the circumstances of these cases, and after considering the Debtors' immediate need for the use of the DIP Financing, adequate and appropriate notice of the Final Hearing was given pursuant to Rule 4001(c)(1) of the Bankruptcy Rules and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois; and the preliminary hearing on the Motion (the "*Preliminary Hearing*") having been held on May 11, 2005; no objections having been filed to the relief requested in the Motion; and the Lender having agreed to provide the DIP Financing on the terms and conditions set forth in this Order;

2

Now, upon the record of the Preliminary Hearing, and a sufficient showing having been made on the record, and after due deliberation, and good and sufficient cause appearing therefor, the Court hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.    On May 10, 2005 (the "*Petition Date*"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code commencing these chapter 11 cases.

B.    The Debtors have continued in the management and operation of their business and property as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official creditors' committee has been appointed in any of the above-captioned, jointly administered chapter 11 cases.

C.    Before the Petition Date, VenCore Solutions, LLC ("*VenCore*") provided equipment and extended other financial accommodations to NGC under that certain Master Lease Number 4002 Agreement dated as of August 26, 2004 by and between NGC and VenCore (together with all related agreements, the "*Master Lease*").

D.    The Debtors have represented (i) that, in order to satisfy their obligations to VenCore and, as a result, cause the liens and security interests granted to VenCore pursuant to the Master Lease to be extinguished, it would be required to pay VenCore the total amount of approximately $121,728 (the "*VenCore Pre-Petition Obligations*") and (ii) they do not have any counterclaim, setoff, defense or objection against VenCore relating to the VenCore Pre-Petition Obligations.

E.    The Debtors have further represented that, as more specifically described in the Motion and the Master Lease, the VenCore Pre-Petition Obligations are secured by security interests in and liens on certain collateral which constitutes substantially all of NGC's Assets.

3

F.     Pending payment in full by the Debtors of the VenCore Prepetition Obligations pursuant to the terms of this Order, VenCore has agreed to the granting to the Lender of senior priming liens pursuant to section 364(d) of the Bankruptcy Code to the extent of the Debtors' interim borrowings under the Interim Order dated as of May 11, 2005 and pursuant to the DIP Agreement.

G.     The Debtors acknowledge that there are no other Liens on the Collateral except for (i) the liens and security interests under the Master Lease; and (ii) certain equipment lessors.

H.     On or about May 19, 2005, the Debtors filed a motion (the *"Sale and Procedures Motion"*) seeking authority to sell substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, to establish bidding procedures for such sale, and to seek approval of the Debtors' entry into that certain Asset Purchase Agreement (the *"APA"*) with Lender or a higher bidder.

I.     Based on the evidence presented to this Court by the Debtors, it appears that (i) an immediate need exists for the Debtors to obtain the DIP Financing to continue the operation of the Debtors' businesses long enough to consummate a sale of substantially all of their assets as will be contemplated by the Sale and Procedures Motion; (ii) the Debtors' anticipated cash flow will, in the near future, be insufficient to fund their operations; (iii) without such DIP Financing, the Debtors will be unable to pay their employees and to meet certain key strategic direct operating expenses; and (iv) without such DIP Financing, the likelihood of the Debtors consummating a sale of substantially all of their assets or the value realized from such sale will be greatly diminished. Absent entry of this Order and the financing provided for hereunder, it is likely that the Debtors' operations will be required to shut down, a going concern sale process will not be undertaken and the result will be immediate and irreparable harm to the Debtors'

4

bankruptcy estates. Therefore, entry of this Order and approval of the DIP Financing will benefit the Debtors and their estates.

      J.      Lender has agreed to extend DIP Financing on the terms and conditions contained herein and in the DIP Loan Agreement for the purpose of providing funds to enable the Debtors to fund certain key post-petition obligations pending the sale of their assets as will be contemplated by the Sale and Procedures Motion.

      K.      Based on the Motion and in view of the Debtors' current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code merely as an administrative expense pursuant to sections 364(b) or 364(c)(1) of the Bankruptcy Code. The Lender has conditioned the DIP Financing upon the grant to the Lender of (i) an administrative expense allowable under section 503(b) of the Bankruptcy Code with priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 105, 503(b), 506(c) and 507(b) of the Bankruptcy Code, subject, as to priority, only to fees payable pursuant to 28 U.S.C. §1930(a)(6); and (ii) a perfected, first-priority Lien on the Collateral.

      L.      The terms of the DIP Financing, taken as a whole, are more favorable to the Debtors than those available from alternative sources. The terms of the DIP Financing have been negotiated in good faith and at arm's length between the Debtors and Lender, are fair and reasonable under the circumstances and are enforceable in accordance with their terms. Consequently, any credit extended to the Debtors by Lender under the terms of this Order shall be deemed to have been extended in good faith as that term is used in section 364(e) of the Bankruptcy Code, and the Lender is entitled to the benefits and protections of section 364(e) of the Bankruptcy Code.

M.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Order is entered in a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (O).

N.     The Lender has consented to the terms and conditions contained in this Order.

**ACCORDINGLY, IT IS HEREBY ORDERED AND DECREED THAT:**

1.     The Motion is granted in all respects. The Debtors shall be and hereby are authorized to borrow the funds shown in the Sources and Uses Statement (the "*Sources and Uses Statement*") attached hereto as <u>Exhibit A</u>, and to seek other financial accommodations from Lender on the terms and conditions contained in this Order. The Debtors are authorized and directed to enter into and deliver the DIP Loan Agreement attached hereto as <u>Exhibit B</u> and the other DIP Loan Documents in each case including amendments thereto. The Debtors are further authorized and directed to perform all of their obligations under the DIP Loan Documents to give effect to the terms of the financing provided by this Order.

**Authorization to Incur the DIP Financing**

2.     All post-petition advances made by Lender to the Debtors shall be (i) made in accordance with the terms of this Order and the DIP Loan Documents, as amended by this Order; (ii) evidenced by the Lender's books and records; and (iii) to the extent not otherwise credited to the Lender's purchase price for the Debtors' assets pursuant to the APA, payable in full upon the Termination Date.

3.     All post-petition advances to the Debtors by Lender incurred from time to time hereunder and pursuant to the Interim Order entered by this Court on May 11, 2005 shall hereinafter be referred to as the "*Post-Petition Advances*." The balance of the Post-Petition Advances shall not at any given time exceed $350,000.00. The Post-Petition Advances, the Loan Fee (as defined below), the interest on the Post-Petition Advances, and all other sums owing to

6

Lender in connection with the DIP Financing shall be referred to herein and constitute collectively the *"Post-Petition Obligations."*

4.      The Post-Petition Obligations shall bear interest at the rate of 12% per annum (the *"Lender Rate"*). The default rate of interest with respect to the Post-Petition Obligations after the occurrence of an Event of Default shall be the Lender Rate plus 5%.

5.      The Debtors shall pay to Lender a fee (*"Loan Fee"*) for the DIP Financing incurred hereunder and under the Final Order equal to $3,500. The Loan Fee shall be fully earned and payable when the Debtors receive the benefit of the initial Post-Petition Advance and shall constitute a Post-Petition Obligation.

6.      The Sources and Uses Statement sets forth on a line item basis the intended uses of the Post-Petition Advances and the dollar amount not to exceed the amount earmarked for such uses. The Debtors shall use the Post-Petition Advances only in accordance with the Sources and Uses Statement.

7.      Except as otherwise provided in this Order, the Post-Petition Obligations shall be:

(i)     claims entitled to the status of superpriority administrative expenses, in accordance with section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses, whether heretofore or hereafter incurred, specified in, or ordered by the Court pursuant to any other section of the Bankruptcy Code, including, without limitation, sections 105, 326, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code;

(ii)    secured pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority perfected Lien on all present and after acquired property of the Debtors; and

(iii)   secured pursuant to section 364(c)(3) of the Bankruptcy Code, by a perfected junior Lien on any property of the Debtors that is otherwise subject to a valid and perfected Lien on the Petition Date that is not subsequently released.

Except as specifically and expressly provided in this Order, the terms and conditions of the Post-Petition Advances hereunder, the creation, perfection, and priority of the liens and security

7

interests granted to the Lender, and all other terms and conditions evidencing and governing the Post-Petition Obligations hereunder shall be upon the terms and conditions as set forth in the DIP Loan Documents, as supplemented or amended hereby. Lender shall not be required to enter into any other agreements, file any financing statements, mortgages or other documents in any jurisdiction or take any other action in order to evidence the Post-Petition Obligations or to validate or perfect the security interests and liens granted to it by this Order.

8.       To the extent that the Lender makes a Post-Petition Advance under this Order, the Debtors shall use such cash or credit solely for the purposes set forth in the Sources and Uses Statement.

### Security for the DIP Financing; Administrative Claims

9.       As security for the full and timely payment and performance of the Post-Petition Obligations, the Lender is hereby granted, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, a Lien on the DIP Collateral. The Liens authorized hereunder shall be first priority, except as otherwise provided in this Order.

10.       Pursuant to section 364(d) of the Bankruptcy Code, until the VenCore Pre-Petition Obligations are paid in full, the Lender is hereby granted priming liens senior to the liens and security interests of VenCore in the Debtors' assets solely to the extent of the outstanding amount of the Post-Petition Advances, provided, however, until the VenCore Prepetition Obligations are discharged in full, the outstanding amount of the Post-Petition Advances shall not exceed $50,000 as agreed to by VenCore and the Debtors in that certain Letter Agreement dated as of May 10, 2005. The Liens granted hereunder shall not be subordinated to or *pari passu* with any other Lien, however arising. The Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Collateral.

11.     As set forth in the Sources and Uses Statement, the Debtors are hereby authorized and directed to pay and discharge, in full, the VenCore Prepetition Obligations as soon as reasonably practicable. The Debtors shall not use any portion of the Post-Petition Advances in excess of the $50,000 described in the immediately preceding paragraph until the VenCore Prepetition Obligations are paid and discharged in full.  Upon payment in full of the VenCore Prepetition Obligations, any claims, interest or right, either arising prior to or subsequent to the Petition Date, that VenCore may have against the Debtors' estates is hereby forever, waived, released and discharged.

12.     The Liens in favor of the Lender described herein shall be deemed valid, binding, enforceable and perfected upon entry of this Order, and shall not be subject to any Lien which is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Order or the DIP Loan Documents, the avoidance of a Lien on, or claim with respect to, property of the Debtors under sections 544, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code shall not diminish or otherwise affect the validity or priority of the Liens granted with respect to such property to the Lender or any superpriority claims granted to Lender hereunder.

13.     Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the Liens granted by or pursuant to this Order.

14.     Lender may, in its sole discretion from time to time, file any such financing statements, mortgages, notices of lien or similar instruments, or take any other action to validate or perfect any such security interest, mortgage, or other Lien, as the Lender shall deem appropriate in accordance with the terms of this Order and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Order.

The Debtors and their officers are hereby directed to furnish to Lender any information requested by it in connection with any such filings.

15.    A certified copy of this Order, in the discretion of Lender, may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Order for filing and recording.

16.    Pursuant to sections 363 and 364 of the Bankruptcy Code, any provisions in any of the leases of nonresidential real property under which the Debtors is a lessee (each, a "*Lease*" and collectively, the "*Leases*") and any provisions in any of the license agreements under which the Debtors are a licensee, that require the consent or approval of one or more of the Debtors' landlords or licensors or any other person or governmental authority, as the may be, in order for the Debtors to pledge or mortgage its interests in such Lease or other agreement, or that prohibits or conditions the granting of any Liens herein, are and shall be deemed inconsistent with the provisions of the Bankruptcy Code and are and shall have no force and effect with respect to the transactions granting the Liens by the Debtors in accordance with this Order.

17.    The administrative priority for the Post-Petition Obligations granted hereunder shall be subordinate only to fees payable pursuant under 28 U.S.C. §1930(a)(6). Except with respect to fees payable under 28 U.S.C. §1930(a)(6), no other claim or expense, having a priority senior to or *pari passu* with that granted to Lender in this Order, shall be granted in these chapter 11 cases, or any superseding chapter 7 cases, while any portion of the Post-Petition Obligations or the commitments of Lender to make Post-Petition Advances remain outstanding. Other than as expressly provided in this Order, no costs or expenses of administration shall be imposed against Lender, their claims, or the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

10

**Reporting and Access Matters; Sale Process**

18.    Upon reasonable advance notice, a representative or representatives of Lender, or agent of Lender, may enter and remain at the places of business of the Debtors at any time during ordinary business hours and may observe the Debtors' operations, and review the Debtors' books and records, but shall not in any respect direct or participate in the management of the day-to-day business operations of the Debtors.

19.    The Debtors shall provide the Lender with such information as the Lender may reasonably request concerning the Debtors' post-petition business operations and the financial condition of the Debtors.

**Events of Default and Termination Date**

20.    The occurrence of any one or more of the following events (regardless of the reason therefor) shall, unless expressly waived in writing by the Lender, constitute an *"Event of Default"*:

(a)    any of the Events of Default listed in Section 8 of the DIP Loan Agreement which are hereby incorporated herein as if part of this Order.

(b)    the assertion by the Debtors of claims arising under section 506(c) of the Bankruptcy Code against Lender;

(c)    the commencement by any other party in interest of any other claims, actions, causes of action or contested matters against Lender; and

(d)    using the Post-Petition Advances or a portion thereof for any uses other than as set forth in the Sources and Uses Statement in contravention of paragraph 6 of this Order.

24.    Notwithstanding the provisions of sections 362 and 1121(b) and (c) of the Bankruptcy Code and without order of or application or motion to the Court, upon the occurrence of an Event of Default, and at all times during the continuance thereof, the Lender may, on 3 Business Days prior written notice to the Office of the United States Trustee and the Debtors, during which time the Debtors will have the opportunity to cure such Event of Default

11

as provided in Section 9.1 of the DIP Loan Agreement and/or file a motion or adversary proceeding with the Bankruptcy Court seeking, *inter alia*, a resolution of any dispute regarding whether an Event of Default exists and/or has been cured by the Borrowers: (i) declare the Post-Petition Obligations to be immediately due and payable, (ii) seek to convert any of these chapter 11 cases to a case under chapter 7 or to have a chapter 11 trustee appointed in any of these chapter 11 cases, and (iii) exercise any and all rights and remedies allowed under the DIP Loan Documents or this Order; provided, however, that in the case of an Event of Default as specified in subparagraphs (14), (15), 16) and (18) of Section 8 of the DIP Loan Agreement, the automatic stay provisions of section 362 of the Bankruptcy Code are hereby deemed modified as to Lender to permit Lender or its designee to immediately exercise any and all rights and remedies allowed under the DIP Loan Documents with respect to the Collateral, including the liquidation of the Debtors' assets, upon prompt written notice to the Debtors and the United States Trustee. Lender's failure to exercise any of the rights under this paragraph shall not constitute a waiver of any of its rights.

25.    After the occurrence of an Event of Default, the obligations and rights of Lender with respect to all transactions which have occurred prior to such termination shall remain unimpaired and unaffected by any such termination and shall survive such termination.

26.    Upon the occurrence of an Event of Default and provided that if such Event of Default has not been cured prior to the expiration of the cure period set forth in Section 9.1 of the DIP Loan Agreement and Borrowers have not filed a motion or adversary proceeding with the Bankruptcy Court seeking, *inter alia*, a resolution of a dispute regarding whether an Event of Default exists and/or has been cured by the Borrowers, the Lender is hereby authorized to exercise any of its rights and remedies listed in Section 9 of the DIP Loan Agreement which are

12

incorporated herein as if part of this Order and the automatic stay shall be deemed automatically modified or lifted with respect thereto.

27.    Notwithstanding the automatic perfection of the liens and security interests granted to the Lender pursuant to this Order, to the extent that the Lender chooses to take any further action to validate or perfect its liens or security interests granted hereunder and the Debtors refuse to sign their name on, or fail timely to execute and deliver any of the documents required for perfection or validation, the Lender (and any of Lender's officers, employees, or agents designated by Lender) shall be appointed as the Debtors' true and lawful attorney for the limited purpose of carrying out the acts or omissions described above in this paragraph. Moreover, upon the occurrence of an Event of Default and provided that if such Event of Default has not been cured prior to the expiration of the cure period set forth in Section 9.1 of the DIP Loan Agreement and the Debtors have not filed a motion or adversary proceeding with the Bankruptcy Court seeking, *inter alia*, a resolution of a dispute regarding whether an Event of Default exists or has been cured by the Debtors, the Lender (and any of Lender's officers, employees, or agents designated by Lender) shall be appointed as the Debtors' true and lawful attorney with power to takes such acts consistent with the rights and remedies afforded to Lender pursuant to Section 9 of the DIP Loan Agreement.

## Termination of DIP Financing

28.    All Post-Petition Obligations shall be repaid in full and Lender's commitment to make Post-Petition Advances shall terminate at the earliest to occur of (i) July 11, 2005, (ii) the Termination Date, and (iii) the closing date of a sale of substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code.

29.     The obligations of the Debtors and the rights, claims, liens, security interests, and priorities of Lender shall remain unimpaired and unaffected by the termination of the interim DIP Financing pursuant to the terms of this Order.

## Miscellaneous Provisions

30.     In taking any actions reasonably related to the Motion or this Order, Lender shall have no liability to any third party (including creditors of the Debtors and any party to any agreement purporting to prohibit, restrict or otherwise limit the Debtors from encumbering any of their assets) and shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

31.     Except with the express consent of Lender, the liens, security interests, rights and remedies granted to Lender pursuant to this Order and the DIP Loan Documents (including, without limitation, Lender's right to demand payment of all Post-Petition Obligations and to enforce its liens and security interests in the Collateral) shall not be modified, altered or impaired in any manner by any plan of reorganization confirmed in these chapter 11 cases or any other order (including, without limitation, any order for financing of or extensions of credit to or incurring of debt by the Debtors pursuant to section 364 of the Bankruptcy Code or otherwise).

32.     The provisions of this Order shall be binding upon and inure to the benefit of Lender, the Debtors, and their respective successors and assigns (including any trustee hereinafter appointed as a representative of any estate herein or of any estate in any superseding case under the Bankruptcy Code).

33.     Unless Lender expressly consents, no plan of reorganization confirmed in these chapter 11 cases shall impair or otherwise modify the rights of the Lender under this Order or the DIP Loan Documents.

14

34.     Lender shall be entitled, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the full amount of the Post-Petition Obligations in connection with any sale of Collateral.

35.     If any or all of the provisions of this Order are hereafter modified, vacated or stayed by subsequent Order of this or any other Court, such stay, modification or vacation shall not affect the validity of any debt to the Lender incurred pursuant to this Order prior to the effective date of such stay, modification or vacation, or the validity and enforceability of any lien or priority authorized hereby with respect to any such debt. Notwithstanding any such stay, modification or vacation, any advances of funds made pursuant to this Order by Lender prior to the effective date of such modification, stay or vacation, to or for the benefit of the Debtors, shall be governed in all respects by the original provisions of this Order, and Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such advances.

36.     Other than as expressly set forth above, no rights are created hereunder for the benefit of any third party, any creditor (other than Lender) or any direct, indirect or incidental beneficiary.

37.     The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit Lender to take any action authorized or contemplated by this Order and to carry out the terms hereof, subject, however, to the satisfaction of any notice, procedural and other conditions contained in this Order or the DIP Loan Documents.

38.     No waiver, modification, or amendment of any of the provisions of this Order shall be effective unless set forth in writing, signed by the parties required under the DIP Loan Documents and approved by the Court.

15

39.     In the event of any irreconcilable inconsistency between this Order and any agreement heretofore or hereafter entered into between the Debtors and the Lender, the terms of this Order shall govern and control.

40.     The provisions of this Order shall be effective upon entry of this Order, and the Clerk of the Court is hereby directed to forthwith enter this Order on the docket of this Court maintained in regard to these chapter 11 cases.

Dated: May 26, 2005

Bruce W. Black

UNITED STATES BANKRUPTCY JUDGE

16

# EXHIBIT "A"

**NATURAL GOLF**
**SOURCES AND USES OF CASH**
**MAY 23 THROUGH JUNE 30**

| | |
|---|---:|
| Expected, as of May 23 | $ 70,000 |
| Draw on DIP | 300,000 |
| Expected cash receipts from sales | 400,000 |
| Payoff of secured lender - Vencore | (117,000) |
| Payroll | (139,000) |
| Fee to D.P.L. Advisory Services, LLC | (30,000) |
| Reimbursement of employee expenses | (2,000) |
| Employee benefits - insurance | (4,000) |
| Inventory purchases | (151,000) |
| Certified Instructor payments | (110,000) |
| Marketing expenditures for May | (58,000) |
| Printing and postage for Summer magazine | (85,000) |
| Systems support for May | (6,000) |
| Office rent | (8,900) |
| Other operating expenses | (35,000) |
| Reserve | (10,000) |
| Expected cash in bank, as of June 30 | 14,100 |

# EXHIBIT "B"

# DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

## by and among

## NATURAL GOLF CORPORATION,

## NATURAL GOLF PRODUCTS CORPORATION

## NATURAL GOLF FIELD SALES CORPORATION

## NATURAL GOLF SCHOOLS CORPORATION

## as Borrowers

## and

## NG ACQUISITION LLC,

## as Lender

## Dated as of May 11, 2005

# TABLE OF CONTENTS

|  |  | Page(s) |
|---|---|---|
| **1.** | **DEFINITIONS AND CONSTRUCTION.** | **1** |
| 1.1 | Definitions | 1 |
| 1.2 | Accounting Terms | 1 |
| 1.3 | Code | 12 |
| 1.4 | Construction | 12 |
| 1.5 | Schedules, Exhibits, and Annexes | 12 |
| **2.** | **LOAN AND TERMS OF PAYMENT** | **12** |
| 2.1 | Term Loan. | 12 |
| 2.2 | Payments | 12 |
| 2.3 | Interest: Rates, Payments, and Calculations. | 13 |
| 2.4 | Maintenance of Loan Account; Statements of Obligations | 14 |
| 2.5 | Loan Fee. | 14 |
| **3.** | **CONDITIONS; TERM OF AGREEMENT.** | **15** |
| 3.1 | Conditions Precedent to the Term Loan | 15 |
| 3.2 | Term. | 15 |
| 3.3 | Effect of Termination. | 15 |
| **4.** | **CREATION OF SECURITY INTEREST.** | **15** |
| 4.1 | Secured, Super-Priority Obligations | 16 |
| 4.2 | Provisions of Financing Order Control. | 16 |
| **5.** | **REPRESENTATIONS AND WARRANTIES.** | **16** |
| 5.1 | No Encumbrances | 16 |
| 5.2 | Equipment | 16 |
| 5.3 | Location of Inventory and Equipment | 17 |
| 5.4 | Location of Chief Executive Office; FEIN | 17 |
| 5.5 | Due Organization and Qualification; Subsidiaries | 17 |
| 5.6 | Due Authorization; No Conflict. | 17 |
| 5.7 | Litigation | 17 |
| 5.8 | No Material Adverse Change | 18 |
| 5.9 | Employee Benefits | 18 |
| 5.10 | Environmental Condition. | 18 |
| 5.11 | Permits and other Intellectual Property. | 18 |
| 5.12 | Leases | 19 |
| 5.13 | Transactions with Affiliates. | 19 |
| **6.** | **AFFIRMATIVE COVENANTS.** | **19** |
| 6.1 | Accounting System. | 19 |
| 6.2 | Collateral Reporting. | 19 |
| 6.3 | Tax Returns. | 20 |
| 6.4 | Corporate Existence | 20 |
| 6.5 | Maintenance of Equipment | 20 |
| 6.6 | Taxes. | 20 |
| 6.7 | Insurance. | 20 |
| 6.8 | No Setoffs or Counterclaims. | 20 |
| 6.9 | Location of Inventory and Equipment | 21 |
| 6.10 | Compliance with Laws | 21 |
| 6.11 | Employee Benefits. | 22 |
| 6.12 | Leases | 22 |
|  |  | 22 |

i

6.13    Intellectual Property...........................................................................22
6.14    Bankruptcy Case...............................................................................23

**7.    NEGATIVE COVENANTS.** ....................................................................23

7.1    Indebtedness ...................................................................................23
7.2    Liens ..............................................................................................23
7.3    Asset Dispositions; Restrictions on Fundamental Changes ...............23
7.4    Guarantee .......................................................................................23
7.5    Nature of Business ...........................................................................24
7.6    Restricted Payments .........................................................................24
7.7    Change of Control ............................................................................24
7.8    Amendments ....................................................................................24
7.9    Accounting Methods ........................................................................24
7.10    Transactions with Affiliates ..............................................................24
7.11    Suspension ......................................................................................24
7.12    Use of Proceeds ..............................................................................24
7.13    No Prohibited Transactions Under ERISA ........................................24

**8.    EVENTS OF DEFAULT.** .........................................................................25

**9.    LENDER'S RIGHTS AND REMEDIES.** ...................................................28

9.1    Rights and Remedies.........................................................................28
9.2    Remedies Cumulative ......................................................................29

**10.    TAXES AND EXPENSES.** ......................................................................29

**11.    WAIVERS; INDEMNIFICATION.** ...........................................................30

11.1    Demand; Protest; etc.........................................................................30
11.2    Lender's Liability for Collateral ........................................................30
11.3    Indemnification ................................................................................30

**12.    NOTICES.** ............................................................................................30

**13.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.** .....................31

13.1    CHOICE OF LAW AND VENUE .....................................................31
13.2    WAIVER OF JURY TRIAL .............................................................32

**14.    DESTRUCTION OF DOCUMENTS.** .......................................................33

**15.    SUCCESSORS.** .....................................................................................33

**16.    NO WAIVERS; CUMULATIVE REMEDIES.** .........................................33

**17.    GENERAL PROVISIONS.** ......................................................................33

17.1    Effectiveness....................................................................................33
17.2    Section Headings .............................................................................34
17.3    Interpretation ..................................................................................34
17.4    Severability of Provisions .................................................................34
17.5    Amendments in Writing ...................................................................34
17.6    Counterparts; Telefacsimile Execution..............................................34
17.7    Revival and Reinstatement of Obligations .........................................34
17.8    Integration........................................................................................34

## SCHEDULES, EXHIBITS and ANNEXES

Schedule 3.1                    Conditions Precedent Documents
Schedule 5.4                    FEIN; Location of Chief Executive Office
Schedule 5.7                    Litigation
Schedule 5.10                   Environmental Conditions
Schedule 5.11                   Intellectual Property Infringement Claims
Schedule 5.12                   Leases; Capital Leases
Schedule 6.10                   Location of Inventory and Equipment
Schedule 7.1                    Permitted Other Indebtedness

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (this "Agreement"), is entered into as of May 11, 2005, among NG ACQUISITION LLC, an Illinois limited liability corporation ("Lender") and Natural Golf Corporation, Natural Golf Products Corporation, Natural Golf Field Sales Corporation and Natural Golf Schools Corporation, each an Illinois corporation and debtors and debtors in possession under Chapter 11 of the Bankruptcy Code (collectively, the "Borrowers").

WHEREAS, the Borrowers, which are debtors and debtors-in-possession in cases pending under chapter 11 of the Bankruptcy Code (collectively, the "Bankruptcy Case") have requested the Lender to make available to the Borrowers a term loan in an amount equal to $350,000, and which loan the Borrowers will use for the purposes permitted hereunder and under the Sources and Uses Statement;

WHEREAS, the Borrowers have continued in possession of their respective assets and in the management of their respective business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on May 10, 2005, the United States Bankruptcy Court for the Northern District of Illinois entered that certain Interim Order Authorizing (A) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. §364 (the "Financing Order") authorizing the Borrowers to enter into this Agreement and granting Lender an allowed superpriority administrative expense claim in the Bankruptcy Case pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in, or arising or ordered under, any sections of the Bankruptcy Code, including without limitation, sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b), 546(c), 726 or 1112 of the Bankruptcy Code and liens and security interests with priority under section 364(c)(2) and section 364(c)(3) of the Bankruptcy Code for all Obligations of Borrowers under this Agreement;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the Lender and the Borrowers hereby agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION.

1.1    Definitions.  As used in this Agreement, the following terms shall have the following definitions:

"Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an Account.

"Accounts" means, with respect to any Person, all currently existing and hereafter arising accounts, contract rights, and all other forms of obligations owing to such Person arising out of the sale or lease of goods or the rendition of services by such Person, irrespective of whether earned by performance, and any and all credit insurance, guaranties, or security therefor.

"Affiliate" means, as applied to any Person, any other Person who directly or indirectly controls, is controlled by, is under common control with such Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to vote five percent (5%) or more of the securities having ordinary voting power for the election of directors or the direct or indirect power to direct the management and policies of a Person.

"Agreement" has the meaning set forth in the preamble hereto.

"Asset Disposition" means any sale, lease, transfer, issuance or other disposition (or a series of related sales, leases, transfers, issuances or dispositions that are part of a common plan) of Stock of (or any other equity interests in) Borrowers or other assets (each referred to for the purposes of this definition as a "disposition") by Borrowers (including any disposition by means of a merger, consolidation or similar transaction) other than (i) a disposition of Inventory in the ordinary course of business; (iii) a disposition of obsolete, surplus or worn out Equipment machinery, fixtures or personal property or Equipment, machinery, fixtures or personal property that is no longer useful in the conduct of the business of Borrowers and that is disposed of in each case in the ordinary course of business.

"Bankruptcy Case" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.), as amended, and any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois, or any other court having jurisdiction over the Bankruptcy Case from time to time, including, without limitation, the United States District Court for the Northern District of Illinois, if and to the extent it withdraws the reference with respect to the Bankruptcy Case, any part thereof, or any matter or proceeding therein.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which Borrowers, any Subsidiary of Borrowers, or any ERISA Affiliate has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Books" means all of Borrowers' books and records including: ledgers; records indicating, summarizing, or evidencing Borrowers' properties or assets (including the Collateral) or liabilities; all information relating to Borrowers' business operations or financial condition; and all computer programs, disk or tape files, printouts, runs, or other computer prepared information.

"Borrowers" has the meanings set forth in the preamble to this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which national banks are authorized or required to close.

"Capital Lease" means any lease which in accordance with GAAP is classified as a capital lease.

"Case" has the meaning ascribed to it in the Recitals.

2

"Change of Control" means (i) a majority of the board of directors of Borrowers or of any direct or indirect holding company thereof shall consist of Persons who are not Continuing Directors of such Person; or (ii) the acquisition by any Person or Group of the power, directly or indirectly, to vote or direct the voting of securities having more than fifty percent (50%) of the voting power for the election of directors of Borrowers, or any direct or indirect holding company thereof.

"Closing Date" means the date of the funding of the Loan.

"Code" means the Illinois Uniform Commercial Code.

"Collateral" means, with respect to Borrowers, all of Borrowers' right, title, and interest in and to each of the following:

(a) the Accounts (including cash therein),

(b) the Books,

(c) the Equipment,

(d) the General Intangibles,

(e) the Inventory,

(f) the Negotiable Collateral,

(g) all other presently owned and hereafter-acquired personal and real property of the Borrowers as provided for in the terms of the Financing Order,

(h) any money, or other assets of Borrowers that now or hereafter come into the possession, custody, or control of Lender, and

(i) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the Collateral, and any and all Accounts, Books, Equipment, General Intangibles, Inventory, Negotiable Collateral, Real Property, money, deposit accounts, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof.

"Collections" means all cash, checks, notes, instruments, and other items of payment (including, insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Continuing Director" of any Person means, as of the date of determination, any Person who (i) was a member of the Board of Directors of such Person on the date of this Agreement or (ii) was nominated for election or elected to the Board of Directors of such Person with the affirmative vote of a majority of the Continuing Directors of such Person who were members of such Board of Directors at the time of such nomination or election.

3

"Cure Period" has the meaning set forth in Section 9.1.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would (if not cured or otherwise remedied during such time) be an Event of Default.

"Dollars" or "$" means United States dollars.

"Equipment" means, with respect to any Person, all of such Person's present and hereafter acquired machinery, machine tools, motors, equipment, furniture, furnishings, fixtures, vehicles (including motor vehicles and trailers), tools, parts, goods (other than consumer goods, farm products, or Inventory), wherever located, including, (a) any interest of such Person in any of the foregoing, and (b) all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1000 et seq., amendments thereto, successor statutes, and regulations or guidance promulgated thereunder.

"ERISA Affiliate" means (a) any corporation subject to ERISA whose employees are treated as employed by the same employer as the employees of Borrowers under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of Borrowers under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Borrowers are a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any party subject to ERISA that is a party to an arrangement with Borrowers and whose employees are aggregated with the employees of Borrowers under IRC Section 414(o).

"ERISA Event" means: (a) a Reportable Event with respect to any Benefit Plan or Multiemployer Plan, (b) the withdrawal of Borrowers, any of its Subsidiaries or ERISA Affiliates from a Benefit Plan during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA), (c) the providing of notice of intent to terminate a Benefit Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) the institution by the PBGC of proceedings to terminate a Benefit Plan or Multiemployer Plan, (e) any event or condition (i) that provides a basis under Section 4042(a)(1), (2), or (3) of ERISA for the termination of, or the appointment of a trustee to administer, any Benefit Plan or Multiemployer Plan, or (ii) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA, (f) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of Borrowers, any of its Subsidiaries or ERISA Affiliates from a Multiemployer Plan, or (g) providing any security to any Plan under Section 401(a)(29) of the IRC by Borrowers or its Subsidiaries or any of their ERISA Affiliates.

"Event of Default" has the meaning set forth in Section 8.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and any successor statute thereto.

4

"FEIN" means Federal Employer Identification Number.

"Final Order" shall mean an order, judgment, ruling or other decree of the Bankruptcy Court or other court of competent jurisdiction, which judgment, order or other decree (a) has not been reversed, stayed, modified or amended and as to which (i) the time to appeal, petition for certiorari or seek reargument or rehearing has expired and (ii) no appeal, reargument, petition for certiorari or rehearing is pending or any right to appeal, reargue, petition for certiorari or seek rehearing has been waived in writing in a manner satisfactory to the Lender or (b) if an appeal, reargument, petition for certiorari or rehearing thereof has been denied, the time to take any further appeal or petition for certiorari or further reargument or rehearing has expired.

"Financing Order" has the meaning ascribed to such term in the recitals hereto.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"General Intangibles" means, with respect to any Person, all of such Person's present and future general intangibles and other personal property (including contract rights, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, Permits, Licenses, patents, trade names, trademarks, servicemarks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, literature, reports, catalogs, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims), other than goods, Accounts, and Negotiable Collateral.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational or governing documents of such Person.

"Governmental Authority" means any nation or government, any state, province, or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through Stock or capital ownership or otherwise, by any of the foregoing.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that

contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; provided, however, that any Indebtedness, or Stock of a Person existing at the time such Person becomes a Borrowers (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Borrower.

"Indebtedness" means, with respect to any Person on any date of determination (without duplication) (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations of such Person in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations of such Person under capital leases, (d) all obligations or liabilities of others secured by a Lien on any property or asset of such Person, irrespective of whether such obligation or liability is assumed, and (e) any obligation of such Person guaranteeing or intended to guarantee (whether guaranteed, endorsed, co-made, discounted, or sold with recourse to such Person) any indebtedness, lease, dividend, letter of credit, or other obligation of any other Person.

"Indemnified Liabilities" has the meaning set forth in Section 11.3.

"Indemnified Person" has the meaning set forth in Section 11.3.

"Intangible Assets" means, with respect to any Person, that portion of the book value of all of such Person's assets that would be treated as intangibles under GAAP.

"Intellectual Property" has the meaning ascribed thereto in Section 5.11.

"Interim Order" shall mean the order of the Bankruptcy Court entered in the Case on May __, 2005 pursuant to Sections 363 and 364 of the Bankruptcy Code, inter alia, authorizing Debtor, as debtor-in-possession, to borrow $350,000.

"Inventory" means, with respect to any Person, all present and future inventory in which such Person has any interest, including goods held for sale or lease or to be furnished under a contract of service and all of such Person's present and future raw materials, work in process, finished goods, and packing and shipping materials, wherever located.

"Investment" in any Person means any direct or indirect advance, loan (other than advances to customers in the ordinary course of business that are recorded as accounts payable on the balance sheet of such Person) or other extension of credit (including by way of guarantee or similar arrangement, but excluding any debt or extension of credit represented by a bank deposit other than a time deposit) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Stock, Indebtedness or similar instruments issued by such Person.

"Investment Property" means "investment property" as that term is defined in Section 9-115 of the Code.

6

"IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Lease" means any lease or other agreement, no matter how styled or structured, under which Borrowers is entitled to the use or occupancy of any space.

"Legal Requirements" means all applicable international, foreign, federal, state, and local laws, judgments, decrees, orders, statutes, ordinances, rules, regulations, or Permits.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lender Expenses" means all costs or expenses (including taxes, and insurance premiums) required to be paid by Borrowers under any of the Loan Documents that are paid or incurred by Lender; reasonable fees or charges paid or incurred by Lender in connection with Lender's transactions with Borrowers, including, reasonable fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal and/or valuations (including periodic Personal Property Collateral appraisals and or valuations), real estate surveys, real estate title policies and endorsements, and environmental audits; reasonable costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise); charges paid or incurred by Lender resulting from the dishonor of checks; costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Personal Property Collateral, or any portion thereof, irrespective of whether a sale is consummated; reasonable costs and expenses paid or incurred by Lender in examining the Books; costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with Borrowers or any guarantor; costs and expenses incurred by Lender or any third party in connection with obtaining or enforcing the Financing Order and a Final Order, and Lender's reasonable attorneys fees and expenses incurred in advising, structuring, drafting, reviewing, administering, amending, terminating, enforcing (including reasonable attorneys fees and expenses incurred in connection with the Case), defending, or concerning the Loan Documents, irrespective of whether suit is brought.

"Lien" means any interest in property securing an obligation owed to, or a claim by, any Person other than the owner of the property, whether such interest shall be based on the common law, statute, or contract, whether such interest shall be recorded or perfected, and whether such interest shall be contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances, including the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, adverse claim or charge, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also including reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"Loan Account" has the meaning set forth in Section 2.4.

"Loan Documents" means this Agreement, any note or notes executed by Borrowers and assigned to or payable to Lender, the Interim Order, the Financing Order and any other agreement entered into, now or in the future, in connection with this Agreement.

"Loans" means the Term Loan covered in definition of "Obligations."

"Material Adverse Change" means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of the Borrowers, (b) the material impairment of the ability of Borrowers to perform its obligations under the Loan Documents or of Lender to enforce the Obligations, or (c) a material impairment of the priority of Lender's Liens with respect to the Collateral.

"Multiemployer Plan" means a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA) to which Borrowers, any of its Subsidiaries, or any ERISA Affiliate have contributed, or were obligated to contribute, within the past six years.

"Obligations" means all loans, the Term Loan, debts, principal, interest (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued), premiums, liabilities (including all amounts charged to Borrowers' Loan Account pursuant hereto), obligations, fees, charges, costs, or Lender Expenses (including any fees or expenses that, but for the provisions of the Bankruptcy Code, would have accrued), lease payments, guaranties, covenants, and duties owing by Borrowers to Lender of any kind and description pursuant to or evidenced by the Loan Documents, and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all Lender Expenses that Borrowers are required to pay or reimburse by the Loan Documents, by law, or otherwise.

"PBGC" means the Pension Benefit Guaranty Corporation as defined in Title IV of ERISA, or any successor thereto.

"Performance Compensation Agreement" means any agreements between Borrowers and any executive officer of Borrowers pursuant to which Borrowers provide deferred compensation to such officer by crediting amounts (as determined under a formula set forth in such agreement) to an identified account for the benefit of such executive officer. Performance Compensation Agreements entered into after the date of this Agreement shall provide that no payment shall be required to be made by Borrowers thereunder if such payment is not permitted under this Agreement and that the Borrowers' obligations to make payments thereunder shall be subordinated to the Obligations.

"Permits" of a Person shall mean all rights, franchises, permits, authorities, licenses, certificates of approval or authorizations, including licenses and other authorizations issuable by a Governmental Authority, which pursuant to applicable Legal Requirements are necessary to permit such Person lawfully to conduct and operate its business as currently conducted and to own and use its assets.

8

"Permitted Business" means any business which is the same as or related, ancillary or complementary to, the business of the Borrowers on the date of this Agreement, as reasonably determined by the Board of Directors of the Borrowers.

"Permitted Capital Expenditure" means, with respect to any Person, any expenditure which (i) may be capitalized in accordance with GAAP, (ii) falls within the aggregate limits set forth on the Sources and Uses Statement and (iii) either (A) is made to purchase equipment leased pursuant to a Capital Lease permitted under clause (xv) of the definition of "Permitted Investment") or (B) the direct benefit of which is realized by the Borrowers making such expenditure.

"Permitted Discretion" means Lender's good faith judgment based upon any factor which it believes in good faith (i) will or could reasonably be expected to adversely affect the value of the Collateral or the enforceability or priority of Lender's Liens thereon, or the amount which Lender would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of such Collateral; (ii) suggests that any Collateral report or financial information delivered to Lender by any Person on behalf of Borrowers is incomplete, inaccurate or misleading in any material respect; or (iii) creates or could reasonably be expected to result in an Event of Default. In exercising such judgment, Lender may consider the financial and business climate of the various industries of the Borrowers and any other factors that change the credit risk of lending to Borrowers on the security of the Collateral. The burden of establishing lack of good faith shall be on Borrowers.

"Permitted Investment" means an Investment by Borrowers in (i) a Wholly-Owned Subsidiary of Borrowers; provided, however, that the primary business of such Wholly-Owned Subsidiary is a Permitted Business and such Wholly-Owned Subsidiary is also one of the Borrowers; (ii) another Person if as a result of such Investment, such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all of its assets to, Borrowers or a Wholly-Owned Subsidiary thereof; provided, however, that in each case such Person's primary business is a Permitted Business, and provided that such Person shall execute and deliver an amendment to the Loan Documents to become one of the Borrowers, and shall execute, if applicable, such financing statements and other documents and take such other actions as Lender shall reasonably require in order to cause such Person's assets to be subject to Lender's Lien; (iii) Temporary Cash Investments; (iv) receivables owing to Borrowers, created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; (v) payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business; (vi) prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Borrowers; (vii) Investments in connection with pledges, deposits, payments or performance bonds made or given in the ordinary course of business in connection with or to secure statutory, regulatory or similar obligations, including obligations under health, safety or environmental obligations; and (viii) Permitted Capital Expenditures.

"Permitted Liens" means (a) Liens held by Lender created by the Loan Documents, (b) Liens imposed by law for taxes, fees, assessments and other governmental charges that are not yet due or are being contested in good faith by the Borrowers, (c) carriers',

9

warehousemen's, mechanics', materialmen's, landlord's, banker's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 45 days or are being contested in good faith by the Borrowers, (d) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, and (e) Liens arising by operation of law on insurance policies and proceeds thereof to secure the financing of premiums thereunder.

"Permitted Protest" means the right of Borrowers to protest any Lien other than any such Lien that secures the Obligations, tax (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on the books of Borrowers in an amount that is reasonably satisfactory to Lender, (b) any such protest is instituted and diligently prosecuted by Borrowers in good faith, and (c) Lender is satisfied that, while any such protest is pending, there will be no material impairment of the enforceability, validity, or priority of any of Lender's Liens in and to the Collateral.

"Person" means and includes natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning ascribed to such term in the Financing Order.

"Plan" means any employee benefit plan, program, or arrangement maintained or contributed to by Borrowers or with respect to which Borrowers may incur liability.

"Preferred Stock", as applied to the Stock of any corporation, means Stock of any class or classes (however designated) which is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Stock of any other class of such corporation.

"Pre-Petition Indebtedness" has the meaning ascribed to such term in the Financing Order.

"Real Property" means any estates or interests in real property now or hereafter acquired by Borrowers.

"Reportable Event" means any of the events described in Section 4043(c) of ERISA or the regulations thereunder other than a Reportable Event as to which the provision of thirty (30) days notice to the PBGC is waived under applicable regulations.

"Retiree Health Plan" means an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA that provides benefits to individuals after termination of their employment, other than as required by Section 601 of ERISA.

"Sale Agreement" means that certain Asset Purchase Agreement dated as of April __, 2005 by and between Borrowers and Lender.

10

"SEC" means the United States Securities and Exchange Commission and any successor Federal agency having similar powers.

"Sources and Uses Statement" shall mean that certain sources and uses of funds statement attached hereto as Exhibit A, as may be amended from time to time with the prior written consent of Lender.

"Stock" means all shares, options, warrants, membership interests, partnership interests, participations, or other equivalents (regardless of how designated) of or in a corporation, limited liability company, partnership or equivalent entity, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subordinated Obligation" means any Indebtedness of Borrowers (whether outstanding on the date of this Agreement or thereafter Incurred) which is subordinate or junior in right of payment to the Obligations pursuant to a written agreement.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock or other ownership interests having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"Temporary Cash Investments" means any of the following: (i) any Investment in direct obligations of the United States of American or any agency thereof or obligations guaranteed by the United States of America or any agency thereof; (ii) Investments in time deposit accounts, certificates of deposit and money market deposits maturing within 365 days as of the date of acquisition thereof issued by a bank or trust company which is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital surplus and undivided profits aggregating in excess of $250 million (or the foreign currency equivalent thereof) and whose long-term debt, or whose parent holding company's long-term debt, is rated "A" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 435 under the Securities Act), (iii) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (i) above entered into with a bank meeting the qualifications described in clause (ii) above; (iv) Investments in commercial paper, maturing not more than 365 days after the date of acquisition, issued by a corporation (other than an Affiliate of Borrowers) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P; (v) Investments in securities with maturities of six months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's and (vi) Investments in mutual funds whose investment guidelines restrict such funds' investments to those satisfying the provisions of clauses (i) through (v) above.

"Term Loan" has the meaning set forth in Section 2.1.

"Voidable Transfer" has the meaning set forth in Section 17.7.

"Wholly-Owned Subsidiary" means a Subsidiary of Borrowers, at least 95% of the Stock of which (other than directors' qualifying shares) is owned by Borrowers or another Wholly-Owned Subsidiary of Borrowers.

1.2    Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto.

1.3    Code. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein.

1.4    Construction. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or any other Loan Documents, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in the Loan Documents to this Agreement or any of the Loan Documents shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable.

1.5    Schedules, Exhibits, and Annexes. All of the schedules, exhibits and annexes attached to this Agreement shall be deemed incorporated herein by reference.

**2.    LOAN AND TERMS OF PAYMENT.**

2.1    Term Loan.

Subject to the terms and conditions of this Agreement, Lender agrees to make a term loan to Borrowers on the Closing Date in the original principal amount equal in the aggregate to THREE HUNDRED AND FIFTY THOUSAND DOLLARS ($350,000.00) consisting of (i) approximately $115,000 to repay in full the Pre-Petition Indebtedness and (ii) of approximately $235,000 to be used for working capital purposes in accordance with the terms of this Agreement (the "Term Loan").

2.2   Payments.

(a) Payments by Borrowers.

(i)   The principal amount of the Term Loan shall be repaid on the earliest to occur of (i) sixty days after the Closing Date; (ii) the occurrence of an Event of Default in accordance with the terms set forth in Sections 8 and 9 hereof; or (iii) the entry of an Order in the Bankruptcy Court approving the sale of any Assets or Collateral to a party other than Lender, unless pursuant to the written consent of Lender. In the event that the Lender, or an Affiliate of the Lender, is the successful purchaser at the sale of any Assets or Collateral, all Obligations hereunder, less $50,000, shall be credited to the purchase price of such Assets or Collateral.

(ii)   All payments to be made by Borrowers shall be made without set-off, recoupment, deduction, or counterclaim, except as otherwise required by law or provided herein. Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Lender at Lender's address set forth in Section 12 and shall be made in immediately available funds, no later than 11:00 a.m. (Chicago time) on the date specified herein. Any payment received by Lender later than 11:00 a.m. (Chicago time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(iii)   Whenever any payment is due on a day other than a Business Day, such payment shall be made on the following Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(b) Application and Reversal of Payments.   All payments from Borrowers not relating to principal or interest of the Term Loan or not constituting payment of specific fees, and all proceeds of its Collateral received shall be applied, first, to pay any fees or expense reimbursements then due to Lender from Borrowers under the Loan Documents; second, to pay interest due Lender in respect of the Term Loan; and third, to pay principal of the Term Loan; provided, that if no Obligations are outstanding, Lender shall promptly return such remaining proceeds to Borrowers.

(c) Taxes.   Any and all payments by Borrowers hereunder or under the other Loan Documents shall be made, in accordance with this Section 2.2(c), free and clear of and without deduction for any and all present or future income or other taxes, levies imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority ("Taxes"), excluding taxes imposed on or measured by the net income or capital of Lender by the jurisdictions under the laws of which it is organized or is resident or carries on business through a permanent establishment located therein or any political subdivisions thereof. If Borrowers shall be required by law to deduct any non-excluded Taxes from or in respect of any sum payable hereunder or under any other Loan Document, (i) the sum payable shall be increased as much as shall be necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section 2.2(c)), Lender receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) Borrowers shall

13

make such deductions, and (iii) Borrowers shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Any refunds or overpayments of such taxes received by or credited to Lender shall be applied pursuant to Section 2.2(b). Within thirty (30) days after the date of any payment of Taxes, Borrowers shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof.

2.3    Interest: Rates, Payments, and Calculations.

(a) Interest Rate. Except as provided in clauses (c) and (d) below, all Obligations shall bear interest at a per annum rate of twelve percent (12%).

(b) Default Rate. Upon the occurrence and during the continuation of an Event of Default, (i) all Obligations shall bear interest at a per annum rate equal to five percent (5%) above the then applicable interest in effect under Section 2.3(a).

(c) Payments. Borrowers hereby authorize Lender without prior notice to Borrowers, to charge all interest payable hereunder, all Lender Expenses (as and when incurred), and all other payments due under any Loan Document to Borrowers' Loan Account, which amounts thereafter shall accrue interest at the rate then applicable to Obligations made hereunder.

(d) Computation. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year for the actual number of days elapsed.

(e) Intent to Limit Charges to Maximum Lawful Rate. In no event shall the interest rates payable under the Loan Documents, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and Lender in executing and delivering the Loan Documents, intend legally to agree upon the rate or rates of interest and manner of payment stated within them; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.4    Maintenance of Loan Account; Statements of Obligations. Lender shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with all Obligations made by Lender to Borrowers or for Borrowers' account, including accrued interest, Lender Expenses, and any other payment Obligations. In accordance with Section 2.2, each Loan Account will be credited with all payments received by Lender from Borrowers or for Borrowers' account. Lender shall render monthly statements regarding the Loan Account to Borrowers, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Expenses owing, and such statements shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and Lender unless, within thirty (30) days after receipt thereof by Borrowers,

14

Borrowers shall deliver to Lender written objection thereto describing the error or errors contained in any such statements.

2.5    Loan Fee.    Borrowers agree to pay to Lender a Closing Fee of $3,500 payable upon funding of the Term Loan.

## 3.    CONDITIONS; TERM OF AGREEMENT.

3.1    Conditions Precedent to the Term Loan.    The obligation of Lender to make the Term Loan is subject to the fulfillment, to the satisfaction of Lender and its counsel, of each of the following conditions on or before the Closing Date:

(a) the Interim Order shall have been entered in the Bankruptcy Case;

(b) Lender shall have received each of the documents and items listed on Schedule 3.1 (which is incorporated herein and made a part of this Agreement), in form and substance reasonably satisfactory to Lender, duly executed and in full force and effect, as applicable;

(c) No Material Adverse Change shall have occurred since April 20, 2005; and

(d) all other Loan Documents in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance reasonably satisfactory to Lender and its counsel.

3.2    Term.

(a) This Agreement shall become effective upon the execution and delivery hereof by the Borrowers and Lender and shall continue in full force and effect for a term ending on the earlier of (i) sixty days after the Closing Date; (ii) after the occurrence of an Event of Default in accordance with the terms set forth in Sections 8 and 9 hereof; or (iii) the entry of an Order in the Bankruptcy Court approving the sale of any Assets or Collateral to a party other than Lender, unless pursuant to the written consent of Lender.

(b) Lender shall have the right to terminate its obligations under this Agreement after giving the notice and providing the opportunity to cure as described in Section 9.1 upon the occurrence and during the continuation of an Event of Default. Upon the maturity date of the Loans or the earlier termination of this Agreement pursuant to the terms hereof, the parties acknowledge and agree that the Obligations immediately shall become due and payable.

3.3    Effect of Termination.

On the date of termination of this Agreement, all Obligations (including the Term Loan) immediately shall become due and payable without notice or demand. No termination of this Agreement, however, shall relieve or discharge Borrowers of Borrowers' duties, Obligations, or covenants hereunder or under the other Loan Documents or the Financing Order, and Lender's continuing security interests in the Collateral shall remain in effect until all

Obligations (other than contingent indemnification obligations for which no claims have been made) have been fully and finally discharged.

## 4.    CREATION OF SECURITY INTEREST.

### 4.1    Secured, Super-Priority Obligations

(a) On and after the Closing Date, the provisions of the Loan Documents and the Financing Order are effective to create in favor of the Lender, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Financing Order) in all right, title and interest in the Collateral, enforceable against the Borrowers subject to any liens on account of the Pre-Petition Indebtedness which shall be satisfied in full as authorized and directed under the terms of this Agreement and the Financing Order.

(b) Pursuant to section 364(c)(2) and (3) of the Bankruptcy Code and the Financing Order, all amounts owing by the Borrowers under the Agreement will be secured by a first-priority perfected Lien on the Collateral, subject only to valid, perfected, nonavoidable and enforceable Liens existing as of the Petition Date, including, without limitation, any liens on account of the Pre-Petition Indebtedness which shall be satisfied in full as authorized and directed under the terms of the Financing Order.

(c) Pursuant to section 364(c) of the Bankruptcy Code and the Financing Order, all obligations of the Borrowers at all times will constitute allowed super-priority administrative expense claims in each of the Cases having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

The Financing Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Lender.

### 4.2    Provisions of Financing Order Control.

This Agreement is qualified in its entirety by the Financing Order. To the extent any provisions in this Agreement conflict with any provisions of the Financing Order, the provisions of the Financing Order shall control. Lender shall also be deemed to have all rights and protections afforded to Lender under the terms of the Financing Order even if such rights or protections are not explicitly addressed in this Agreement.

## 5.    REPRESENTATIONS AND WARRANTIES.

In order to induce Lender to enter into this Agreement, Borrowers make the following representations and warranties to Lender which shall be true, correct, and complete in all respects as of the date hereof, and shall be true, correct, and complete in all respects as of the Closing Date, and such representations and warranties shall survive the execution and delivery of this Agreement:

### 5.1    No Encumbrances.    Borrowers have good and indefeasible title to its Collateral, free and clear of Liens (except for Permitted Liens), except as otherwise agreed by Lender.

16

5.2    Equipment.  All of the Equipment is used or held for use in Borrowers' business.

5.3    Location of Inventory and Equipment.  The Inventory and Equipment are not stored with a bailee, warehouseman, or similar party (without Lender's prior written consent) and are located only at the locations identified on Schedule 6.10 or otherwise permitted by Section 6.9.

5.4    Location of Chief Executive Office; FEIN.  The chief executive office of the Borrowers and the Borrowers' FEIN is listed on Schedule 5.4.

5.5    Due Organization and Qualification; Subsidiaries.

Borrowers are duly organized and existing and in good standing under the laws of the jurisdiction of their incorporation, organization or formation, as applicable, and are qualified and licensed to do business in, and in good standing in, any jurisdiction where the failure to be so licensed or qualified could reasonably be expected to result in a Material Adverse Change.

5.6    Due Authorization; No Conflict.

(a) The execution, delivery, and performance by Borrowers of this Agreement and the other Loan Documents to which they are parties have been duly authorized by all necessary corporate, limited liability or partnership action, as applicable.  Borrowers have the requisite corporate power to make the representations, warranties and covenants made by them in this Agreement.

(b) Subject to the entry of the Financing Order, the execution, delivery, and performance by Borrowers of this Agreement and the other Loan Documents to which they are parties do not and will not (i) violate any provision of federal, state, or local law or regulation (including Regulations T, U, and X of the Federal Reserve Board) applicable to Borrowers, the Governing Documents of Borrowers, or any order, judgment, or decree of any court or other Governmental Authority binding on Borrowers, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation or lease of Borrowers, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of Borrowers, other than Permitted Liens, or (iv) require any approval of stockholders or any approval or consent of any Person under any material contractual obligation of Borrowers except, in each case referred to in clause (i) and (ii), to the extent that the failure to do so could not reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Change.

(c) Other than the consent of the Bankruptcy Court, the execution, delivery, and performance by Borrowers of this Agreement and the other Loan Documents to which Borrowers are a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any federal, state, foreign, or other Governmental Authority or other Person.

(d) Subject to the entry of the Financing Order, this Agreement and the other Loan Documents to which Borrowers are a party, when executed and delivered by Borrowers will be the legally valid and binding obligations of Borrowers, enforceable against Borrowers in

17

accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(e) Subject to the entry of Financing Order, the Liens granted by Borrowers to Lender in and to the Collateral pursuant to this Agreement and the other Loan Documents are validly created first-priority Liens (subject only to Permitted Liens) in all the Collateral.

5.7     Litigation.  Other than the Chapter 11 cases, there are no unstayed actions or proceedings pending by or against Borrowers before any court or administrative agency and Borrowers have no knowledge of any pending or threatened litigation, governmental investigations, or claims, complaints, actions, or prosecutions involving Borrowers, except for matters disclosed on Schedule 5.7.

5.8     No Material Adverse Change.  All financial statements relating to Borrowers that have been delivered by Borrowers to Lender have been prepared in accordance with GAAP and fairly present Borrowers' financial condition as of the date thereof in all material respects and Borrowers' results of operations for the period then ended in all material respects, subject to, in the case of any unaudited interim financial statements, normal year-end adjustments and the lack of footnote disclosures.  Other than events previously disclosed to Lender necessitating the filing of the Chapter 11 cases and the filing of the Chapter 11 cases themselves, there has not been a Material Adverse Change with respect to Borrowers since the date of the latest financial statements submitted to Lender on or before the Closing Date.

No transfer of property is being made by Borrowers and no obligation is being incurred by Borrowers in connection with the transactions contemplated by this Agreement or the other Loan Documents with the actual, express and willful intent to hinder, delay or defraud either present or future creditors of Borrowers.

5.9     Employee Benefits.  Neither Borrowers, nor any of their Subsidiaries, or any of their ERISA Affiliates maintain or contribute to any Benefit Plan.  No ERISA Event has occurred nor has any other event occurred that may result in an ERISA Event that could reasonably be expected to result in a Material Adverse Change.  Neither Borrowers, nor any of its Subsidiaries, any ERISA Affiliate, or any fiduciary of any Plan are subject to any material direct or indirect liability with respect to any Plan under any applicable law, treaty, rule, regulation, or agreement.  Neither Borrowers nor any of its Subsidiaries or any ERISA Affiliate are required to provide security to any Plan under Section 401(a)(29) of the IRC.

5.10    Environmental Condition.  Except as disclosed on Schedule 5.10:  (a) none of Borrowers' properties or assets has ever been used by Borrowers or, to the best of Borrowers' knowledge, by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials; (b) to the best of Borrowers' knowledge, none of Borrowers' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, or a candidate for closure pursuant to any environmental protection statute; (c) no Lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned or operated by Borrowers; and (d) Borrowers have not received a written summons,

18

citation, notice, or directive from the Environmental Protection Agency or any other Governmental Authority concerning any action or omission by Borrowers resulting in the releasing or disposing of Hazardous Materials into the environment.

5.11    Permits and other Intellectual Property.   Borrowers own or possess adequate licenses or other rights to use all Permits, patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, copyrights, trade secrets and know-how that are necessary for the operation of its business as currently conducted (collectively, the "Intellectual Property").   Borrowers do not own any federally registered Intellectual Property.   Other than as set forth on Schedule 5.11, no claim is pending or, to the actual knowledge of Borrowers, threatened to the effect that Borrowers infringes upon, or conflicts with, the asserted rights of any other Person under any Intellectual Property.   No claim is pending or, to the actual knowledge of Borrowers, threatened to the effect that any such Intellectual Property owned or licensed by Borrowers, or in which Borrowers otherwise has the right to use is invalid or unenforceable by Borrowers.

5.12    Leases.    Schedule 5.12 is a schedule of all presently unexpired Leases and Capital Leases with respect to Borrowers.   Each of such Leases and Capital Leases is in full force and effect, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally, to the actual knowledge of Borrowers.  No party to any such Lease or Capital Lease to which Borrowers are a party as of the date of this Agreement is in default or violation, other than a default that resulted from the filing of the Case, of any such Lease or Capital Lease and Borrowers have not received any written notice or threat of cancellation of any such Lease or Capital Lease.  Borrowers have made all payments due under its Leases and/or Capital Leases listed on Schedule 5.12.  Borrowers hereby authorize Lender at any time and from time to time, following the occurrence and during the continuation of an Event of Default, to contact any of Borrowers' lessors/landlords in order to confirm Borrowers' continued compliance with the terms and conditions of the Lease(s) and/or Capital Leases(s) between Borrowers and that lessor/landlord and to discuss such issues concerning Borrowers' occupancy thereunder as Lender may determine.

5.13    Transactions with Affiliates. All transactions with Affiliates of Borrowers permitted by this Agreement are or will be in the ordinary course of Borrowers' business, upon fair and reasonable terms, adequately disclosed to Lender, and no less favorable to Borrowers than could be obtained in an arm's length transaction with a non-Affiliate.

## 6.    AFFIRMATIVE COVENANTS.

Borrowers covenant and agree, that until full and final payment of the Obligations (other than contingent indemnification obligations for which no claims have been made), and unless Lender shall otherwise consent in writing, Borrowers shall do all of the following:

6.1    Accounting System. Maintain a standard and modern system of accounting that enables Borrowers to produce financial statements in accordance with GAAP, and maintain records pertaining to the Collateral that contain information as from time to time may be requested by Lender.

6.2    Collateral Reporting. Provide Lender with reports in form satisfactory to Lender as to its Collateral or the financial condition of Borrowers as Lender may reasonably request from time to time.

6.3    Tax Returns. Allow Lender to inspect at Borrowers' chief executive office copies of Borrowers' future federal income tax returns, and any amendments thereto, within thirty (30) days of the filing thereof with the Internal Revenue Service, and cause copies to be made of any such materials as Lender may reasonably request for purposes of Lender's further inspection and study.

6.4    Corporate Existence.  Subject to Section 7.3, Borrowers shall preserve and maintain their existence and rights (both charter and statutory).

6.5     Maintenance of Equipment. Maintain the Equipment in good operating condition and repair (ordinary wear and tear excepted), and make all necessary replacements thereto so that the value and operating efficiency thereof shall at all times be maintained and preserved. Other than those items of Equipment that constitute fixtures on the Closing Date, Borrowers shall not permit any item of Equipment to become a fixture to real estate or an accession to other property, and such Equipment shall at all times remain personal property.

6.6    Taxes.

(a) Cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against Borrowers or any of their property or assets to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest.

(b) Make due and timely payment or deposit of all such federal, state and local taxes, assessments, or contributions required of it by law.

(c) Make timely payment or deposit of all tax payments and withholding taxes required of it by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, provincial and federal income taxes, and will, upon request, furnish Lender with evidence reasonably satisfactory to Lender indicating that Borrowers have made such payments or deposits.

6.7    Insurance.

(a) At its expense, obtain and maintain (i) insurance of the type necessary to insure the Collateral, for the full replacement cost thereof, against any loss by fire, lightning, windstorm, hail, explosion, aircraft, smoke damage, vehicle damage, and other risks from time to time included under "extended coverage" policies, in such amounts as are ordinarily insured against by other owners in similar businesses, but in any event in amounts sufficient to prevent Borrowers from becoming a co-insurer under such policies and (ii) insurance for such other risks as Lender may reasonably require in such amounts as are ordinarily insured against by other owners in similar businesses. Borrowers shall add Lender as an additional insured on all its insurance policies insuring the Collateral.

20

(b) All such policies of insurance shall be in such form and with such companies as may be reasonably satisfactory to Lender. All insurance required herein shall be written by companies which are authorized to do insurance business in the State in which Borrowers do business. Borrowers shall use commercially reasonable efforts to ensure that every policy of insurance referred to in this Section 6.7 shall contain an agreement by the insurer that it will not cancel such policy except after 30 days (or in the case of nonpayment of a premium, 10 days) prior written notice to Lender and that any loss payable thereunder shall be payable notwithstanding any act or negligence of Borrowers or Lender which might, absent such agreement, result in a forfeiture of all or a part of such insurance payment.

(c) Certificates satisfactory to Lender evidencing such insurance shall be delivered to Lender at least fifteen (15) days prior to the expiration of the existing or preceding policies. Borrowers shall give Lender prompt notice of any loss exceeding $250,000 covered by such insurance, and following the occurrence and during the continuation of an Event of Default, Lender shall have the right on behalf of Borrowers to adjust any such loss. Lender shall have the exclusive right to adjust all such losses payable under any such insurance policies without any liability to Borrowers whatsoever in respect of such adjustments following the occurrence and during the continuation of an Event of Default, any monies received as payment for any such loss under any insurance policy including the insurance policies mentioned above in amounts greater than $250,000 per occurrence shall be paid over to Lender and disbursed to Borrowers under stage payment terms satisfactory to Lender for application to the cost of repairs, replacements, or restorations. All repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction. Upon the occurrence of an Event of Default, Lender shall have the right to apply all prepaid premiums to the payment of the Obligations in accordance with Section 2.2(b).

(d) Borrowers shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 6.7, unless Lender shall be included thereon as an additional insured upon receipt thereof by Borrowers. Borrowers immediately shall notify Lender whenever such separate insurance is taken out, specifying the insurer thereunder and full particulars as to the policies evidencing the same, and certificates of such policies immediately upon receipt thereof by Borrowers shall be provided to Lender.

6.8     No Setoffs or Counterclaims. Make payments hereunder and under the other Loan Documents by or on behalf of Borrowers without setoff or counterclaim and free and clear of, and without deduction or withholding for or on account of, any federal, state, provincial or local taxes.

6.9     Location of Inventory and Equipment. Keep the Inventory and Equipment only at the locations identified on Schedule 6.10; provided, however, that Borrowers may amend Schedule 6.10 by written notice to Lender prior to the date on which the Inventory or Equipment is moved to such new location, so long as such new location is within the continental United States or Canada, and so long as, at the time of such written notification, Borrowers provide any financing statements or fixture filings necessary or advisable to perfect and continue perfected Lender's Liens on such assets.

21

6.10   Compliance with Laws.  Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, including the Fair Labor Standards Act and the Americans With Disabilities Act, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

6.11   Employee Benefits.

(a) Cause to be delivered to Lender: (i) promptly, and in any event within ten (10) Business Days after Borrowers or any of its Subsidiaries know that an ERISA Event has occurred that could reasonably be expected to result in a Material Adverse Change, a written statement of the chief financial officer of Borrowers describing such ERISA Event and any action that is being taking with respect thereto by Borrowers, any such Subsidiary or ERISA Affiliate, and any action taken or, to the knowledge of Borrowers, threatened by the IRS, Department of Labor, or PBGC. Borrowers or any of its Subsidiaries, as applicable, shall be deemed to know all facts known by the administrator of any Benefit Plan of which it is the plan sponsor, (ii) promptly, and in any event within three (3) Business Days after the filing thereof with the IRS, a copy of each funding waiver request filed with respect to any Benefit Plan and all written communications received by Borrowers, any of its Subsidiaries or, to the knowledge of Borrowers, any ERISA Affiliate with respect to such request, and (iii) promptly, and in any event within three (3) Business Days after receipt by Borrowers, any of its Subsidiaries or, to the knowledge of Borrowers, any ERISA Affiliate, of the PBGC's intention to terminate a Benefit Plan or to have a trustee appointed to administer a Benefit Plan, copies of each such written notice.

(b) Cause to be delivered to Lender, upon Lender's request, each of the following: (i) a copy of each Plan (or, where any such plan is not in writing, complete description thereof) (and if applicable, related trust agreements or other funding instruments) and all amendments thereto, all written interpretations thereof and written descriptions thereof that have been distributed to employees or former employees of Borrowers or its Subsidiaries; (ii) the most recent determination letter issued by the IRS with respect to each Benefit Plan; (iii) for the three most recent plan years, annual reports on Form 5500 Series required to be filed with any governmental agency for each Benefit Plan; (iv) all actuarial reports prepared for the last three (3) plan years for each Benefit Plan; (v) a listing of all Multiemployer Plans, with the aggregate amount of the most recent annual contributions required to be made by Borrowers or any ERISA Affiliate to each such plan and copies of the collective bargaining agreements requiring such contributions; (vi) any written information that has been provided to Borrowers or any ERISA Affiliate regarding withdrawal liability under any Multiemployer Plan; and (vii) the aggregate amount of the most recent annual payments made to former employees of Borrowers or its Subsidiaries under any Retiree Health Plan.

6.12   Leases.  Pay when due all rents and other material amounts payable under any Leases or Capital Leases to which any Borrower is a party or by which Borrowers' properties and assets are bound, unless such payments are the subject of a Permitted Protest.

6.13   Intellectual Property.  Promptly notify Lender upon the acquisition of any rights to Intellectual Property and execute and deliver all security agreements and other documents that

Lender reasonably may request, in form reasonably satisfactory to Lender, to perfect Lender's Liens on such Intellectual Property.

6.14    Bankruptcy Case.    Promptly upon the filing of each motion, application or similar filing relating to the Bankruptcy Case and promptly upon the entry of each order, decree or judgment relating to the Bankruptcy Case, the Borrowers shall provide the Lender's counsel with a copy of each such motion, application, filing, order, decree or judgment via Federal Express or facsimile.

## 7.    NEGATIVE COVENANTS.

Borrowers covenant and agree, that until full and final payment of the Obligations (other than contingent indemnification obligations for which no claims have been made), Borrowers will not do any of the following without Lender's prior written consent:

7.1    Indebtedness.

(a) Incur any Indebtedness (or apply to the Bankruptcy Court for authority to do so) other than:

(i)    Indebtedness evidenced by this Agreement and the other Loan Documents;

(ii)    Indebtedness set forth on Schedule 7.1, including extensions and refinancings thereof which do not increase the principal amount of such Indebtedness as of the date of such extension or refinancing in excess of the sum of the principal amount so financed, any applicable premium or repayment penalty, accrued interest and direct costs incurred in connection with such refinancing; and

(iii)    Indebtedness arising from the obligations of any of the Borrowers under a capital lease or similar equipment leasing or financing transaction;

(iv)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument issued by Borrowers drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within two (2) business days of its Incurrence.

7.2    Liens.    Create, incur, assume, or permit to exist, directly or indirectly, any Lien on or with respect to any of the Collateral (other than Permitted Liens).

7.3    Asset Dispositions; Restrictions on Fundamental Changes.    Borrowers shall not make any Asset Disposition in contravention of the terms of the Sale Agreement.

7.4    Guarantee.    Except as otherwise permitted by this Agreement, guarantee or otherwise become in any way liable with respect to the obligations of any third Person, except by endorsement of instruments or items of payment for deposit to the account of Borrowers and customary indemnification obligations in favor of purchasers in connection with dispositions permitted under the definition of Asset Dispositions.

23

7.5    Nature of Business. Engage substantially in any business other than a Permitted Business.

7.6    Restricted Payments. Declare or pay any dividend or make any distribution on or in respect of its Stock (including any payment in connection with any merger or consolidation involving Borrowers) other distributions payable solely in its common stock or other equity securities.

7.7    Change of Control. Cause, permit, or suffer, directly or indirectly, any Change of Control.

7.8    Amendments. Without the prior written consent of Lender, not to be unreasonably withheld or delayed, directly or indirectly amend, modify, alter, increase, or change any of the material terms or conditions of any agreement, instrument, document, indenture, or other writing evidencing or concerning any Indebtedness owing to Borrowers. In the case of any amendment, modification, alteration, increase or change to any document described in this Section 7.8, Borrowers shall promptly provide Lender with copies of the documents evidencing any such amendment, modification, alteration, increase or change.

7.9    Accounting Methods. Materially modify or change its method of accounting without providing Lender with prior written notice of the same. Enter into any agreement with any third party accounting firm or service bureau for the preparation or storage of Borrowers' accounting records without providing Lender with prior written notice of the same.

7.10    Transactions with Affiliates. Except as permitted by Section 7.6, directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrowers except for transactions that are in the ordinary course of Borrowers' business, upon fair and reasonable terms, that are adequately disclosed to Lender, and that are no less favorable to Borrowers than could be obtained in an arm's length transaction with a non-Affiliate.

7.11    Suspension. Suspend or go out of a substantial portion of its business.

7.12    Use of Proceeds. Use the proceeds of the Loans made hereunder for any purpose other than (a) on the Closing Date, (i) to disburse the proceeds to pay in full the Pre-Petition Indebtedness, (ii) to pay transactional fees, costs, and expenses incurred in connection with this Agreement and (b) thereafter, consistent with the terms and conditions hereof, for its lawful and permitted corporate purposes.

7.13    No Prohibited Transactions Under ERISA. Directly or indirectly:

(a) engage, or permit any Subsidiary of Borrowers to engage, in any prohibited transaction which is reasonably likely to result in a civil penalty or excise tax described in Sections 406 of ERISA or 4975 of the IRC for which a statutory or class exemption is not available or a private exemption has not been previously obtained from the Department of Labor;

(b) permit to exist with respect to any Benefit Plan any accumulated funding deficiency (as defined in Sections 302 of ERISA and 412 of the IRC), whether or not waived;

24

(c) fail, or permit any Subsidiary of Borrowers to fail, to pay timely required contributions or annual installments due with respect to any waived funding deficiency to any Benefit Plan;

(d) terminate, or permit any Subsidiary of Borrowers to terminate, any Benefit Plan where such event would result in any liability of Borrowers, any of their Subsidiaries or any ERISA Affiliate under Title IV of ERISA;

(e) fail, or permit any Subsidiary of Borrowers to fail, to make any required contribution or payment to any Multiemployer Plan;

(f) fail, or permit any Subsidiary of Borrowers to fail, to pay any required installment or any other payment required under Section 412 of the IRC on or before the due date for such installment or other payment;

(g) amend, or permit any Subsidiary of Borrowers to amend, a Plan resulting in an increase in current liability for the plan year such that either Borrowers, any Subsidiary of Borrowers or any ERISA Affiliate are required to provide security to such Plan under Section 401(a)(29) of the IRC; or

(h) withdraw, or permit any Subsidiary of Borrowers to withdraw, from any Multiemployer Plan where such withdrawal is reasonably likely to result in any liability of any such entity under Title IV of ERISA;

which, individually or in the aggregate, results in or reasonably could be expected to result in a claim against or liability of Borrowers, any of their Subsidiaries or any ERISA Affiliate in excess of $100,000.

## 8.    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1    If Borrowers fail to pay when due and payable or when declared due and payable in accordance with the terms of this Agreement, any portion of the Obligations (whether of principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations);

8.2    (i) If Borrowers fail to perform, keep, or observe any term, provision, condition, covenant, or agreement contained in Section 6.1 (Accounting System), Section 6.2 (Collateral Reporting), Section 6.3 (Tax Returns), Section 6.5 (Maintenance of Equipment), the portion of Section 6.6 (Taxes) as pertains to state franchise taxes, Section 6.9 (Location of Inventory and Equipment), Section 6.10 (Compliance with Laws), Section 6.11 (Employee Benefits), or Section 6.12 (Leases) of this Agreement and such failure continues for a period of thirty (30) Business Days after the earlier to occur of (i) the date upon which a senior officer of the Borrowers becomes aware of such default and (ii) the date upon which written notice thereof is given to Borrowers by Lender; (ii) if Borrowers fail to perform, keep, or observe any term,

25

provision, condition, covenant, or agreement contained in this Agreement or in any of the other Loan Documents (giving effect to any grace periods, cure periods, or required notices, if any, expressly provided for in such Loan Documents), in each case, other than any such term, provision, condition, covenant, or agreement that is the subject of another provision of this Section 8, in which event such other provision of this Section 8 shall govern;

8.3     If there is a Material Adverse Change;

8.4     If any material portion of the Collateral is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and not released from such lien or attachment (other than Permitted Liens) within thirty (30) days;

8.5     If Borrowers are enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; provided, however, that Lender may, in its reasonable discretion, evaluate the impact of any such action upon the Borrowers;

8.6     If a notice of Lien, levy, or assessment (other than Permitted Liens) in excess of $15,000 is filed of record with respect to the Collateral by the United States federal government or any department, agency, or instrumentality thereof, or if any taxes or debts owing at any time hereafter to any one or more of such entities becomes a Lien (other than Permitted Liens), whether choate or otherwise, upon any of the Collateral;

8.7     (i) If a notice of Lien, levy, or assessment (other than Permitted Liens) with respect to any taxes or debts in excess of $15,000 owing is filed of record with respect to any of Borrowers' properties or assets by any state, county, municipal or other non-federal governmental agency, and such Lien, levy or assessment is not (A) fully released, discharged or bonded against before the earlier of thirty (30) days of the date that Borrowers receive notice of same or five (5) days of the date which such property or asset is subject to being forfeited, or (B) the subject of a Permitted Protest; or (ii) if any taxes or debts in excess of $15,000 owing at any time hereunder to any one or more of any state, county, municipal or other non-federal governmental agency becomes a Lien (other than Permitted Liens), whether choate or otherwise, upon any of Borrowers' properties or assets and such Lien is not (A) fully released, discharged or bonded against before the due date of such tax or debt or five (5) days of the date when such property or asset is subject to being forfeited or (B) the subject of a Permitted Protest;

8.8     If a judgment or other claim (to the extent not covered by insurance), in excess of $25,000 individually or in the aggregate for all such judgments or other claims, becomes a Lien upon any material portion of the Collateral and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof;

8.9     If there is a material default (other than a default that arose and is existing due to the filing of the Case) in any material agreement to which Borrowers are a party with one or more third Persons and such default (a) occurs at the final maturity of the obligations thereunder, or (b) results in a right by such third Person(s), irrespective of whether exercised, to accelerate the maturity of Borrowers' obligations thereunder, to terminate such agreement, or to refuse to renew such agreement pursuant to an automatic renewal right therein;

26

8.10     If any material misstatement or material misrepresentation exists now or hereafter in any warranty, representation, statement, or report made to Lender by Borrowers or any officer, employee, agent, or director of Borrowers on or as of the date made or deemed made, or if any such warranty or representation is withdrawn;

8.11     The Bankruptcy Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or Borrowers shall file an application for an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code; or an application shall be filed by Borrowers for the approval of any other superpriority administrative claim or lien in the Bankruptcy Case which is *pari passu* with or senior to the claims or liens of the Lender against Borrowers, or there shall arise any such *pari passu* or senior superpriority administrative claim or lien;

8.12     The Bankruptcy Court shall enter an order or orders that are not vacated, reversed, rescinded or stayed pending appeal granting relief from  the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) in any assets of Borrowers with a value equal to or in excess of $10,000; or an order shall be entered by the Bankruptcy Court granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to permit the creation, perfection or enforcement of any judgment, lien, levy or attachment based on any judgment, whether or not such judgment arises from or gives rise to a pre-petition or post-petition claim with a value equal to or in excess of $10,000; or an order shall be entered by the Bankruptcy Court that is not stayed pending appeal otherwise granting relief from the automatic stay to any creditor of Borrowers (other than the Lender) with respect to any claim with a value equal to or in excess of $10,000; provided, however, that it shall not be an Event of Default if relief from the automatic stay is lifted solely for the purpose of (i) allowing such creditor to determine the liquidated amount of its claim against Borrowers; or (ii) seeking payment from a source other than the Borrowers or any of its assets.

8.13     Borrowers shall propose a Plan of Reorganization in any of the Bankruptcy Cases which does not include a provision for termination of the Agreement and indefeasible payment in full in cash of all Obligations of Borrowers hereunder and under the other Loan Documents on or before the effective date of such Plan of Reorganization;

8.14     An order by the Bankruptcy Court shall be entered, or Borrowers shall file an application for an order, dismissing the Bankruptcy Case which does not require a provision for termination of the Agreement and indefeasible payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents prior to any such dismissal;

8.15     An order by the Bankruptcy Court shall be entered in or with respect to the Bankruptcy Case or Borrowers shall file an application for an order with respect to any Bankruptcy Case, (i) to revoke, reverse, stay, rescind, modify, vacate, supplement or amend the Financing Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have an administrative priority as to Borrowers  equal or superior to the priority of the claims of the Lender in respect of the Obligations (other than the Carve-Out), or (iii) to grant or permit the grant of a Lien on the property of Borrowers;